## Margaretha Schulz, Administratrix of the Estate of Frederick Schulz, Deceased, Appellee, v. National Brewing Company, Appellant.

### Gen. No. 23,250.

MASTER AND SERVANT, § 687*—*when death of employee by explosion of dust in grain elevator shown not result of negligence.* Where defendant, a brewing company, maintained in its brewery building a certain grain elevator, a standard appliance in use for 14 years without an explosion, at the top of which was a fan used to prevent an accumulation of dust in co-ordination with the elevator, according to a system which had been in use in other countries for over 50 years and in parts of the United States for some years, the operation of which removed most but not all of the dust, which was of an explosive nature, but the cause of which explosions was not certainly known, and all of which appliances were in good working order and regularly inspected, *held* that defendant had taken care commensurate with the danger, and, assuming the application of the principle of *res ipsa loquitur* to make out a prima facie case of negligence, was affirmatively proven not guilty of negligence, in an action to recover for the death of plaintiff's intestate, one of its employees, who died from blood poisoning resulting from an injury caused by an explosion in defendant's elevator.

Appeal from the Superior Court of Cook county; the Hon. SAMUEL C. STOUGH, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1917. Reversed with finding of fact. Opinion filed March 13, 1918. *Certiorari* denied by Supreme Court (making opinion final).

LANDON & HOLT, for appellant; BENSON LANDON, of counsel.

JUUL & JUUL, for appellee.

MR. PRESIDING JUSTICE TAYLOR delivered the opinion of the court.

This is an appeal by the National Brewing Company, appellant, from a judgment in the sum of $5,000,

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

recovered by appellee, for negligently causing the death of one Frederick Schulz. His death was the result of a dust or gas explosion upon the premises of the National Brewing Company, appellant. The case has been tried twice. On the first trial, at the close of the plaintiff's evidence, a verdict was directed for the defendant (appellant here), and, on a writ of error to this court [195 Ill. App. 385], the judgment entered on that verdict was reversed and the cause remanded for a new trial, on the ground that "there was evidence tending to show the presence in the elevator of quantities of grain dust and the proximity of lighted gas jets; that such dust is of a highly explosive nature and, on contact with flame or spark, will explode; * * * that the device used by defendant to remove the dust is not effective for the purpose, and that other methods, which a witness described in detail, would prevent such an explosion"; that the evidence fairly tended to support the plaintiff's case and should have been submitted to the jury. Upon the second trial the jury returned a verdict for appellee, and judgment being entered thereon, this appeal was taken.

The accident happened on May 19, 1910, a little before eight o'clock in the morning, at the defendant's brewery, a five-story building situated on the north side of 18th street, at the corner of that street and Lincoln street.

There was a gangway about 16 feet wide and 125 feet long, which extended north through the building to an alley. In the gangway there was a loading platform which commenced at a point 12 or 14 feet north of 18th street and extended 18 or 20 feet towards the alley. The platform was about 18 feet long and about 7 or 8 feet wide, and was on the west side of the gangway. On the west side of the gangway, at the corner of 18th street, there was a small office about 12 by 12 feet. On the top, or fifth floor of the building,

Schulz v. National Brewing Co., 210 Ill. App. 35.

there was a malt room, about 20 by 40 feet in dimensions, and from that room a large storage bin extended down to within a few feet of the basement floor. The grain elevator, in and about which the explosion took place, ran from the basement into the fifth floor, a distance of about 60 feet. A feed pipe or chute, about 6 inches in diameter, ran from the bottom of the bin, and another from the loading platform into the foot of the elevator. The bottom of the elevator, called a "boot," rested on the basement floor and from that there extended upwards two circular galvanized iron pipes or "legs," about 12 inches in diameter and about 3 feet apart. In the "legs" there ran a continuous rubber belt going upward in one and down in the other. To that belt, at intervals of about 15 inches, there were attached buckets or scoops. Between them and the sides of the elevator there was a clearance of about half an inch all around. The buckets scooped up the grain in the boot and carried it to the top of the elevator where it was discharged into conveyers. The grain was let into the bottom of the boot in a regulated amount so that it would not accumulate and stop the machinery. The elevator was usually operated for a short time in the neighborhood of eight o'clock each morning and stood idle for the rest of the day. The basement in which the boot of the elevator stood was about 4 feet below the level of the driveway. It was usually damp and wet down there, owing to the fact that kegs and barrels were washed in the basement. About 3 feet from the boot of the elevator there was a toilet room, which, with the thickness of its wall, occupied about 5 feet in width. There were gas fixtures in the basement but at the time of the explosion, it being broad daylight, none of them was lighted. The evidence shows that after the elevator was used there always remained a small quantity of malt or some cereal in and about the bottom of the boot. The elevator in question was

installed in 1896 and was a standard appliance for that kind of work. It had been in use 14 years and, in that time, had suffered no explosion. It was inspected sometimes once a month and sometimes once in 3 months. At the time of the explosion whole malt, that is, barley after it had gone through the malting process, was being elevated from one of the bins into the malting room on the fifth floor. The evidence is conflicting, however, as to the quantity of dust existing in the nature of a deposit upon the sides and walls and in the head and boot of the elevator. It must be assumed that there was some, although the evidence, of course, does not show any measurable quantity.

At the top of the elevator there was a fan, about 3 feet in diameter and 10 inches wide, which ran at about 1,500 revolutions per minute. It was used to suck the air out of the elevator and in doing so to draw out the dust of the grain and prevent accumulation. The fan operated whenever the elevator was run; the running of the fan co-ordinating with the running of the belt, as the same machinery ran both. The fan, according to its power, sucked the air from the elevator but did not, according to the testimony of Hecht, actually remove all the dust from the "legs" of the elevator. It was installed in May, 1910, and the system of air suction which it represented has been in use in other countries for over 50 years, and in different parts of the United States for some years.

Schulz had been working for the brewery a number of years. He was barn boss and it was his business to see that the alley and the gangway and platform were kept in order. He could clean them himself or have other men do it who were under him.

At the time of the accident, a little before eight o'clock in the morning, May 19, 1910, there was a loud noise, some flame and considerable smoke. Schulz was found immediately afterwards, something over 18 feet from the loading platform. No one saw him in-

Schulz v. National Brewing Co., 210 Ill. App. 35.

jured. When found he had some government stamps in his hands which showed signs of having been partially scorched, and his mustache was singed. He suffered a compound comminuted fracture of the tibia of his right leg, and, as a result, blood poisoning set in and caused his death.

Suess, the defendant's brew master, who was on the fifth floor at the time of the explosion, was blown out onto the roof, through an open window. After the explosion it was found that the elevator boot was broken—had blown out—and the head of the elevator, which was of cast iron—although the pieces were yet in place—was pressed out.

It is contended by the appellee that this is a case of *res ipsa loquitur* and that to avoid liability the appellant must prove that it was not guilty of negligence. On the other hand, it is contended by appellant (1) that it is not a case of *"res ipsa loquitur,"* the deceased being an employee of appellant at the time of the explosion, and (2) that the evidence fails to prove negligence. The explosion was evidently a dust, or, as called by Dr. Wesener, a gas explosion, but what was the actual cause, we do not know. The evidence does not disclose whether it was the result of artificial light or a spark caused by friction, or the result of spontaneous combustion. The question then arises whether the defendant was justified in using the particular appliances and methods which were used, whether they were standard and in good working order and the premises reasonably safe. An expert, Gudeman, called by the plaintiff, was of the opinion that a safer method could have been used to prevent the accumulation of dust; that the "legs," boot and head of the elevator could have been tapped and steam injected or blown in so as to produce some dampness. On the other hand, four witnesses for the defendant were of the opinion that the elevator system which was used was a standard system and that the method

involving the use of steam would be deleterious to the grain, and, therefore, impracticable. On the theory that the evidence shows that the appliances used were of a standard character and that they were in good working order and of the proper and normal kind to do the work in question, and were inspected from time to time, and that the amount of dust which was present in the elevator was a small and uncertain quantity, it would be difficult to perceive any breach of duty on the part of appellant. Such an explosion, according to the evidence, is still something of an unsolved mystery, and, in the elevation of malt and grains, by the use of conventional standard apparatus, seems never to be completely provided against. Of course, it cannot be claimed that the appellant was an insurer. It was bound, as far as the appliances used are concerned, to provide, as the evidence shows it did, that which is considered in the trade and by experts a satisfactory standard machine in good working order. As to the presence of dust in the elevator, there undoubtedly was some, though in what quantity, of course, it is impossible to say. The fan which was used was the appropriate appliance for the purpose, and, as far as the evidence shows, was in good working order at the time of the accident.

In the opinion of this court, when this cause was here before, it was stated that "there was evidence tending to show the presence in the elevator of quantities of grain dust and the proximity of lighted gas jets." In the present record there is no evidence— Kwatkowski does not so testify—that there were lighted gas jets in the basement or in the vicinity of the boot of the elevator. In that same opinion it was said, further, that there was evidence tending to show "that the device used by defendant to remove the dust is not effective for the purpose and that other methods, which a witness described in detail, would prevent such an explosion." The evidence in this record, al-

though it does not prove that the fan did remove every particle of dust from the elevator, proves that it was the proper appliance to be used for the particular purpose and that it was in good working order. As to other methods of prevention, the evidence of Gudeman is entirely outweighed by that of the witnesses for the defendant. It was not shown that appellant in "the exercise of reasonable care in providing a reasonably safe place for the deceased to work," should have used some other method to avoid explosions. Although the elevator had been used for 14 years without an explosion, nevertheless, bearing in mind that it was known that dust and gas explosions do sometimes, though infrequently, under similar circumstances, occur, it was, of course, the duty of appellant to exercise greater precaution than if conducting an entirely innocuous business. In *Commonwealth Elec. Co. v. Melville*, 210 Ill. 70, it was held that a "failure to use some device to guard its wires * * * so that no person could inadvertently touch the cable tended to show a lack of ordinary care." In the instant case, however, there was no known convenient, practical and standard safeguard; and the explosion, therefore, occurred without, at least as far as the evidence shows, any negligence of any kind on the part of appellant. With the knowledge of the art as it is, the care taken by the appellant in providing the mechanism as it existed was, in our opinion, commensurate with the danger. Assuming, therefore, as is contended by the appellee, that the principle of *res ipsa loquitur* applies, that the evidence of injury by explosion made a prima facie case of negligence, yet, as a consideration of all the evidence induces the conclusion that not only was the prima facie case overcome, but affirmatively proves that the appellant was not guilty of negligence, it follows that the appellee has failed in the ultimate to establish a right of action. *Omaha Packing Co. v. Murray*, 112 Ill. App. 233; *Huff v. Austin*,

46 Ohio St. 386. It was an unfortunate tragedy, and it is to be deplored that there has not been devised for common use some entirely safe and practical mechanism which would render such an explosion impossible. Inasmuch, therefore, as the evidence did not prove negligence, as alleged, the judgment will be reversed.

*Reversed with a finding of fact.*

Finding of fact. We find as a fact that the negligence as alleged in the declaration was not proved.